**Starr Indemnity & Liability Company v. North Central Aviation, Inc.**
**Case No. 18-cv-98 (DWF/TNL)**

## <u>INDEX OF EXHIBITS</u>

DECLARATION OF ROBERT W. VACCARO:

<u>Exhibit</u>          <u>Document</u>

| Exhibit | Document |
|---------|----------|
| A | Aircraft Lease Agreement N457MD dated February 15, 2016 |
| B | Aircraft Lease Agreement N753MB dated June 1, 2016 |
| C | North Central Aviation Incident Report N753MB dated December 5, 2016 |
| D | NCA Hazard Identification and Continuous Improvement Reports dated December 5, 2016 |
| E | Starr Indemnity & Liability Company insurance policy no. 1000223033-01 |
| F | Aircraft Flight Log for Aircraft N457MD between 9/17/13 through 12/14/16 |
| G | Complaint in *BreezeAir, LLC v. North Central Aviation, Inc.*, et al., Hennepin County District Court, Civ. No. 27-CV-17-19583 (the "Underlying Lawsuit") dated January 15, 2018 |
| H | Amended Complaint in the Underlying Litigation dated February 23, 2018 |
| I | Excerpts from the deposition transcript of Aaron Holzmer taken in the Underlying Litigation on September 10, 2018 |
| J | North Central Aviation, Inc.'s Memorandum in Support of Its Motion for Partial Summary Judgment dated April 10, 2018 in the Underlying Litigation |
| K | Order Granting and Denying Motions for Summary Judgment in Part dated August 7, 2018 in the Underlying Litigation |
| L | October 24, 2017 letter from Sharon L. Van Dyck to Warren J. Mueller, III |

| Exhibit | Document |
| --- | --- |
| M | November 3, 2017 letter from Warren J. Mueller, III to Sharon L. Van Dyck |
| N | Defendant North Central Aviation, Inc.'s Responses to Plaintiff Starr Indemnity & Liability Company's First Set of Requests for Admissions dated September 12, 2018 |

12551526.1

# EXHIBIT A

## AIRCRAFT LEASE AGREEMENT N457MD

THIS AIRCRAFT LEASE AGREEMENT N457MD (the "Agreement") is made and entered into effective as of February 15, 2016, between BreezeAir LLC, a Minnesota company ("Lessor"), and North Central Aviation Inc, a Minnesota company ("Operator").

WHEREAS, Lessor is the owner of that certain Citation model CJ2 aircraft bearing Manufacturer's Serial Number 525A-0009 and Federal Aviation Administration ("FAA") Registration No. N457MD, together with the engines, appliances, communications equipment, accessories, instruments and other items of equipment installed thereon (collectively, the "Aircraft"); and

WHEREAS, Lessor wishes to lease the Aircraft to Operator for use in Operator's aircraft charter operations, and Operator wishes to lease the Aircraft on such basis from Lessor, all pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of and subject to the terms and conditions herein, Lessor and Operator agree as follows:

### 1. LEASE TERM

Operator hereby agrees to lease the Aircraft from Lessor, and Lessor hereby agrees to lease the Aircraft to Operator, pursuant to the terms and conditions in this Agreement. This Agreement shall commence on the date first written above and continue in full force until the one year anniversary thereof, and thereafter shall automatically renew for one year renewal terms. Either party may terminate this Agreement at the end of the initial yearly term or any renewal term by providing written notice to the other at least 60 days prior to the end of the then-current yearly term, or otherwise pursuant to Section 7 below. (The term of this Agreement, beginning on the date first written above until terminated pursuant to the foregoing, the "Term.") Operator's use of the Aircraft shall be exclusive other than use by Lessor and leases from Lessor to affiliates of Lessor, both as permitted under Federal Aviation Regulations ("FARs") Part 91 and this Agreement. The parties shall cooperate in good faith to resolve any conflicts in scheduling. The Aircraft shall be delivered by Lessor to Operator for each usage at the Anoka County-Blaine Airport (Janes Field) in Anoka, Minnesota (the "Operating Base"), unless otherwise agreed by the parties.

### 2. USE OF AIRCRAFT

(a) <u>Permitted Use</u>. Notwithstanding anything herein to the contrary, during the times the Aircraft is leased to Operator:

(i) <u>Dry Lease</u>. The parties intend that this Agreement shall constitute a "dry" operating lease to Operator for purposes of allowing Operator to use the Aircraft for air taxi operations in accordance with FARs Part 119 and Part 135 and in accordance with Operators' Department of Transportation Certificate No. JVWA272N (the "Operating Certificate") and for training and/or pilot currency checks as permitted herein. Operator

1

EXHIBIT A

shall, at Operator's cost but with Lessor's cooperation, add the Aircraft to the Operating Certificate for all purposes.

(ii) Operational Control. During each usage by Operator, Operator shall have and maintain operational control over the Aircraft. "Operational control" shall mean, consistent with 14 C.F.R. § 1.1 and FAA guidelines (including, without limitation, FAA Notice N8900.4 and Operations Specifications A002 and A008), the exercise of authority over initiating, conducting or terminating a flight. Operator shall exercise complete control over the phases of operation of the Aircraft requiring aviation expertise for all flights under this Agreement. Operator shall also maintain possession, command and control of the Aircraft during all uses hereunder in accordance with Internal Revenue Service Ruling 60-311.

(iii) Flight Crew. Operator shall be solely responsible for supplying a flight crew for Operator's operations. Operator shall ensure that all flight crews (x) are FAA certified and duly qualified to operate the Aircraft in accordance with all applicable laws and regulations, (y) trained in accordance with Operator's operational specifications and manuals, and (z) meet the applicable requirements of the insurance policies required by Section 8 below.

(iv) Security Precautions. Operator shall at all times use reasonable care and diligence to maintain the security and safety of the Aircraft and to abide by applicable security regulations and recommendations of the FAA, Department of Transportation and local airport authorities.

(b) Compliance with Laws. Operator shall not use or cause or permit the Aircraft to be used in any way inconsistent with state, federal or international law or the law of any place to which the Aircraft may go, or contrary to any manufacturers' operation manuals and instructions, or in violation of any airworthiness certificate, license or registration. Operator shall not use or cause or permit the Aircraft to be used in any way that would endanger the registration or airworthiness of the Aircraft.

(c) Compliance with Insurance. Operator shall not operate the Aircraft or permit or suffer the Aircraft to be operated in conflict with the terms of the insurance coverage pursuant to Section 8 of this Agreement. Operator shall abide by all geographical limitations of such insurance.

## 3. RENT, TAXES AND EXPENSES

(a) Rent and Invoicing. As rent for the lease of the Aircraft, the Operator shall pay to the Lessor rent at the hourly rate set forth on Schedule 1 hereto (the "Rent"). By the 15th day of each month during the Term, Operator will provide the Lessor a statement with respect to the prior month (the "Statement") setting forth (i) Aircraft hours used and the corresponding Rent owed, and (ii) reimbursements due to the Operator from the Lessor for expenses incurred by the Operator that are the responsibility of Lessor hereunder (the "Reimbursable Expenses"). If the

Rent owed exceeds the Reimbursable Expenses, Operator shall include a payment equal to the Rent owed less the Reimbursable Expenses to Lessor together with the Statement. If the Reimbursable Expenses exceeds the Rent owed, the Lessor shall pay the Operator an amount equal to the Reimbursable Expenses less the Rent owed within 10 days of the Lessor receiving the Statement.

(b)     Taxes. Operator shall be responsible for any and all taxes (other than those based on Lessor's income), including but not limited to sales, use, embarkation or passenger departure taxes, customs duties, charges or levies of the United States, any state or local government or any foreign government related to Operator's use, possession, or lease of the Aircraft (collectively "Taxes"). Except as otherwise specified in Schedule I or any applicable invoice, neither the Rent nor any other payments to be made by Operator under this Agreement includes the amount of any such taxes which may be assessed or levied by any taxing jurisdictions as a result of the lease of the Aircraft to Operator, or the use of the Aircraft by Operator.

(c)     Operating Costs. Operator shall be responsible for all direct operating expenses related to Operator's use of the Aircraft, including fuel, all necessary ground and flight operations support such as hangar while away from the Operating Base, Aircraft cleaning (interior and exterior), lavatory service, deicing, catering, and Aircraft stocks (i.e. newspapers, beverages, snacks), and all crew hiring costs and crew expenses. During the Term of this Agreement, Lessor shall be solely responsible for the cost and expense of hangaring the Aircraft at the Operating Base, all maintenance work provided or arranged by the Operator, and all insurance coverages proved by the Operator pursuant to the terms of this Agreement. To the extent the Operator initially incurs any costs and expenses that hereunder are the responsibility of the Lessor, the Lessor shall reimburse the Operator pursuant to the terms of Section 3(a) above.

(d)     Payments. All payments or reimbursements due by virtue of this Agreement shall be made to the Lessor or the Operator, as applicable, at such address or bank accounts as may be specified by the Lessor or the Operator, as applicable, by written notice from time to time.

## 4.     TITLE; SECURITY

Title to the Aircraft and all equipment subject to this Agreement is retained by Lessor at all times. Operator may not pledge or encumber the Aircraft in any manner whatsoever, nor permit any liens to attach thereto (other than liens arising by operation of law; liens solely attributable to Lessor, or maintenance or other workman liens arising in the ordinary course of business), and Operator shall promptly cause to be removed any such lien which may be placed on the Aircraft as a result of Operator's action or inaction hereunder. Lessor shall not permit any lien or encumbrance of any kind whatsoever to be created or exist upon the Aircraft if such lien or encumbrance may or does interfere with Operator's quiet use and enjoyment of the Aircraft hereunder.

## 5.     REGISTRATION

3

Operator undertakes that at all times under this Agreement it shall not do or allow to be done anything whereby the registration of the Aircraft with the FAA may be forfeited or imperiled.

6. MAINTENANCE RECORDS; NO ALTERATIONS

(a) Maintenance. At all times during the term of this Agreement, the Aircraft shall be maintained by Operator (at Lessor's sole cost and expense) in strict accordance with Operator's operational specifications and maintenance program and FAA guidelines (including, without limitation, FAA Notice N8900.4 and Operations Specifications A002 and A008). Operator shall maintain all of its log books and records pertaining to the Aircraft during the term of the Agreement in accordance with the FARs. All such records shall be made available for inspection by Lessor upon request and shall be returned to Lessor at the end of the Term.

(b) Use of Aircraft by Lessor. In the event that Lessor or any affiliates of Lessor use the Aircraft in accordance with FAR Part 91, Lessor shall assure that no party performs any maintenance to the Aircraft except under the supervision of and authorization from Operator. In the event of such Part 91 usage, Operator shall perform an appropriate conformity check upon return of the Aircraft to ensure the Aircraft is still in compliance with the Operator's maintenance program and that no unauthorized maintenance has been performed during such usage.

(c) No Alterations. Operator shall not make any modifications or alterations to the Aircraft, other than as required by Operator's operational specifications, without the express written consent of Lessor.

7. TERMINATION

(a) Termination. Either party, as applicable, may immediately terminate this Agreement upon the occurrence of any one of the following:

(i) In the event that either party fails to pay sums due under this Agreement, and such failure is not corrected within 15 days after written notice by the non-defaulting party; or

(ii) In the event the other party operates the Aircraft in a manner not permitted by applicable insurance, Operator's operational specifications or FAA rules or regulations, upon written notice by the non-defaulting party; or

(iii) In the event the other party fails to observe or fulfill any term, condition and/or provision of this Agreement other than those specified in Sections 7(a)(i) or 7(a)(ii) and such failure is not corrected within 30 days after written notice by the non-defaulting party; or

4

(iv)    Upon 30 days receipt by Operator of prior written notice by Lessor if Lessor sells the Aircraft to any third-party not controlled by, under control of, or under common control with Lessor.

(b)    Rights upon Termination.  Upon the termination of this Agreement, all rights of each party hereunder shall immediately cease and terminate, provided that (i) each party shall continue to owe to the other amounts owed at the end of the Term until paid in full, and (ii) the provisions of Sections 4 and 5 shall survive the termination of this Agreement.

8.    INSURANCE

(a)    Insurance.  Operator shall, at Lessor's sole cost and expense, provide insurance coverage from a reputable insurance carrier related to Operator's possession, use, maintenance and operations of the Aircraft, as follows:

(i)    Liability.  The policies will include aircraft liability insurance to insure against liability for personal injuries, death or property damages, or any one or more of them, arising or occasioned in any manner by the acts or omissions of Lessor, Operator, or others with respect to the custody, operation or use of, or with respect to said Aircraft with liability limits of not less than $100,000,000 per occurrence.  Lessor shall be an additional insured on said policies.

(ii)    Hull Insurance.  The policies will insure against the loss or damage from any cause or causes to the Aircraft for not less than $2,700,000.00 unless a different value is agreed upon in writing between Operator and Lessor.  Such policies shall be for the benefit of Lessor with Lessor named as the sole loss payee.  Operator shall be responsible for the amount of the deductible, if any, if the damage to said Aircraft is incurred during Operator's use hereunder.  Such policies need not include coverage against war risks.

(iii)    Conditions.  The policies shall also specifically grant approval for all Operator's pilots that meet the requirements of the policies, including, without limitation, pilots approved by the insurer and pilots that meet the requirements of any "open pilot warranty" under the policy.  Such insurance under this Section 8 shall be primary, without any right of contribution from Operator or any insurance maintained by Operator.

(iv)    Certificates of Insurance.  Operator shall deliver to Lessor a certificate of insurance upon execution of this Agreement, as well as additional certificates from time-to-time as reasonably requested by Lessor, but not less often than annually.

(v)    Lessor's Insurance.  Nothing herein shall prohibit Lessor from maintaining similar policies on the Aircraft, and Lessor shall carry such insurance for all operations of the Aircraft by Lessor or its affiliates and name Operator as an additional insured on all such liability policies.  Each party shall cause its insurance policies to waive any rights of subrogation against the other party.

(b)    Indemnification by Operator. Operator agrees to indemnify, defend, and hold Lessor and all other users of the Aircraft harmless from any and all fines, citations, forfeitures, or penalties of any kind imposed by the FAA or any other governmental entity arising out of operation, use, or possession of the Aircraft by Operator during the term of this Agreement, except to the extent arising from the gross negligence or willful misconduct by Lessor or other users.

(c)    Indemnification by Lessor. Lessor agrees to indemnify, defend, and hold Operator harmless from any and all fines, citations, forfeitures, or penalties of any kind imposed by the FAA or any other governmental entity arising out of the operation, use, or possession of the Aircraft by Lessor or other users through Lessor, except to the extent arising out of the gross negligence or willful misconduct of Operator.

9.    REPRESENTATIONS AND WARRANTIES/DISCLAIMER

(a)    By Lessor. Lessor's represents and warrants to Operator that Lessor has full authority to enter into and fulfill this Agreement and has taken all steps and has done all acts required by applicable law to permit Lessor to enter into and fulfill this Agreement, and upon execution, this Agreement shall become the legal, valid and binding obligation of Lessor, enforceable in accordance with its terms.

(b)    By Operator. Operator represents and warrants to Lessor that:

(i)    Operator is not and shall not be bound by any other agreements, restrictions, or obligations which do or would in any way interfere with or be inconsistent with or be violated by this Agreement, nor shall Operator assume any such obligations or restrictions, which do or would in any way interfere with or be inconsistent with or be violated by this Agreement.

(ii)    Operator has full authority to enter into and fulfill this Agreement and has taken all steps and has done all acts required by applicable law to permit Operator to enter into and fulfill this Agreement and that upon execution, this Agreement shall become the legal, valid and binding obligation of Operator, enforceable in accordance with its terms.

(c)    Disclaimer; Limitation of Liability. EXCEPT AS EXPRESSLY STATED TO THE CONTRARY HEREIN, THE AIRCRAFT IS BEING LEASED BY THE LESSOR TO THE OPERATOR HEREUNDER ON A COMPLETELY "AS-IS, WHERE-IS," BASIS. THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT ARE EXCLUSIVE AND IN LIEU OF, AND OWNER DISCLAIMS AND OPERATOR WAIVES, ALL OTHER REPRESENTATIONS OR WARRANTIES OF EVERY KIND WHATSOEVER, WHETHER EXPRESS OR IMPLIED OR ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE, INCLUDING, WITHOUT LIMITATION, REPRESENTATIONS AND WARRANTIES, WITH RESPECT TO THE AIRCRAFT, OF AIRWORTHINESS, VALUE, CONDITION, DESIGN, MERCHANTABILITY,

COMPLIANCE WITH SPECIFICATIONS, CONSTRUCTION AND CONDITION, OPERATION, FITNESS FOR A PARTICULAR USE, ABSENCE OF LATENT AND OTHER DEFECTS WHETHER OR NOT DISCOVERABLE, ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AND QUALITY OF MATERIALS OR WORKMANSHIP. IN NO EVENT SHALL EITHER PARTY TO THIS AGREEMENT BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES ARISING FROM LOSS OF USE, LOSS OF REVENUE OR PROFIT, OR DIMINUTION IN VALUE OF THE AIRCRAFT.

## 10.   NOTICES

All notices or other communications required under this Agreement shall be in writing and shall be effective when delivered personally or deposited in the U.S. mail, postage prepaid, and addressed to the parties at their respective addresses set forth below, unless by such notice a different party or address shall have been designated in writing from time to time.

> If to Lessor:    BreezeAir, LLC.
> 527 Tower Street NW
> Clearbrook, MN 56634

> If to Operator:    North Central Aviation, Inc.
> 670 West County Road B
> St. Paul, Minnesota 55113

## 11.   MISCELLANEOUS

(a)    Entire Agreement; Amendments.  This Agreement constitutes the entire agreement of the parties as of the date hereof and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises and warranties made with respect to the subject matter of this Agreement.  This Agreement may not be amended except in a writing signed by all parties.

(b)    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibitions or unenforceability in any jurisdiction.  To the extent permitted by applicable law, each of Lessor and Operator hereby waives any provision of applicable law which renders any provision hereof prohibited or unenforceable in any respect.

(c)    No Assignment.  Neither party may assign its rights or obligations under this Agreement without the prior written permission of the other.

(d)    Further Assurances.  The parties hereto agree to cooperate with each other in effectuating this Agreement and, at the reasonable request of the other party, to execute and

7

deliver such further documents or instruments and take such further actions as shall reasonably be requested in order to carry out the purposes of this Agreement.

(e) No Waiver. Neither party shall be deemed to have waived any breach by the other party of any provision of this Agreement unless it expressly does so in writing. If either party shall expressly waive any right hereunder, such waiver shall not be construed as a continuing waiver of other rights under the same or other provisions of this Agreement.

(f) Force Majeure. Either party shall be relieved of its obligations hereunder if the performance hereof is delayed or prevented or interrupted by any cause beyond its reasonable control, including, but not limited to, acts of God, public enemies, war, civil disorder, fire, flood, explosion, labor disputes or strikes, or any acts or orders of any governmental authority.

(g) Dispute Resolution. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Minnesota (excluding its choice of law rules), and any dispute arising hereunder shall be resolved in state or federal courts located in Hennepin County, Minnesota, and each party hereby waives any objection it might have to such a court, whether based on personal jurisdiction, an inconvenient forum, or otherwise. In the event of any legal action or other proceeding concerning any term or condition of the Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred in that action or proceeding in addition to any other relief to which it may be entitled.

[Signature page follows.]

IN WITNESS WHEREOF, the undersigned parties hereby execute this Aircraft Lease Agreement N327ME on the date first written above.

LESSOR:                                    OPERATOR:

BreezeAir, LLC.                            North Central Aviation, Inc.

By:    _Ken Charpentier_                   By:    _____
Print: _Ken Charpentier_                   Print: _Marc R Fradd_
Its:   _owner_                             Its:   _CFO_

## Schedule 1
## FINANCIAL TERMS
### (To be excluded from any FAA or governmental filings)

Operator shall pay Rent to Lessor during the Term at a rate of $1,300.00 per flight hour, provided that Operator shall be allowed to use the Aircraft for up to 5 flight hours per calendar year for training and check flights at a rate of the cost of fuel for such flight hours.

# EXHIBIT B

# AIRCRAFT LEASE AGREEMENT N753MB

THIS AIRCRAFT LEASE AGREEMENT N753MB (the "Agreement") is made and entered into effective as of June 1, 2016, between Investment Leasing LLC., a North Dakota company ("Lessor"), and North Central Aviation Inc, a Minnesota company ("Operator").

WHEREAS, Lessor is the owner of that certain Citation model Citation V aircraft bearing Manufacturer's Serial Number 560·0.07F, and Federal Aviation Administration ("FAA") Registration No. N753MB, together with the engines, appliances, communications equipment, accessories, instruments and other items of equipment installed thereon (collectively, the "Aircraft"); and

WHEREAS, Lessor wishes to lease the Aircraft to Operator for use in Operator's aircraft charter operations, and Operator wishes to lease the Aircraft on such basis from Lessor, all pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of and subject to the terms and conditions herein, Lessor and Operator agree as follows:

## 1. LEASE TERM

Operator hereby agrees to lease the Aircraft from Lessor, and Lessor hereby agrees to lease the Aircraft to Operator, pursuant to the terms and conditions in this Agreement. This Agreement shall commence on the date first written above and continue in full force until the one year anniversary thereof, and thereafter shall automatically renew for one year renewal terms. Either party may terminate this Agreement at the end of the initial yearly term or any renewal term by providing written notice to the other at least 60 days prior to the end of the then-current yearly term, or otherwise pursuant to Section 7 below. (The term of this Agreement, beginning on the date first written above until terminated pursuant to the foregoing, the "Term.") Operator's use of the Aircraft shall be exclusive other than use by Lessor and leases from Lessor to affiliates of Lessor, both as permitted under Federal Aviation Regulations ("FARs") Part 91 and this Agreement. The parties shall cooperate in good faith to resolve any conflicts in scheduling. The Aircraft shall be delivered by Lessor to Operator for each usage at the Anoka County-Blaine Airport (Janes Field) in Anoka, Minnesota (the "Operating Base"), unless otherwise agreed by the parties.

## 2. USE OF AIRCRAFT

(a)     Permitted Use. Notwithstanding anything herein to the contrary, during the times the Aircraft is leased to Operator:

(i)     Dry Lease. The parties intend that this Agreement shall constitute a "dry" operating lease to Operator for purposes of allowing Operator to use the Aircraft for air taxi operations in accordance with FARs Part 119 and Part 135 and in accordance with

1

**EXHIBIT B**

Operators' Department of Transportation Certificate No. JVWA272N (the "Operating Certificate") and for training and/or pilot currency checks as permitted herein. Operator shall, at Operator's cost but with Lessor's cooperation, add the Aircraft to the Operating Certificate for all purposes.

(ii)    Operational Control. During each usage by Operator, Operator shall have and maintain operational control over the Aircraft. "Operational control" shall mean, consistent with 14 C.F.R. § 1.1 and FAA guidelines (including, without limitation, FAA Notice N8900.4 and Operations Specifications A002 and A008), the exercise of authority over initiating, conducting or terminating a flight. Operator shall exercise complete control over the phases of operation of the Aircraft requiring aviation expertise for all flights under this Agreement. Operator shall also maintain possession, command and control of the Aircraft during all uses hereunder in accordance with Internal Revenue Service Ruling 60-311.

(iii)    Flight Crew. Operator shall be solely responsible for supplying a flight crew for Operator's operations. Operator shall ensure that all flight crews (x) are FAA certified and duly qualified to operate the Aircraft in accordance with all applicable laws and regulations, (y) trained in accordance with Operator's operational specifications and manuals, and (z) meet the applicable requirements of the insurance policies required by Section 8 below.

(iv)    Security Precautions. Operator shall at all times use reasonable care and diligence to maintain the security and safety of the Aircraft and to abide by applicable security regulations and recommendations of the FAA, Department of Transportation and local airport authorities.

(b)    Compliance with Laws. Operator shall not use or cause or permit the Aircraft to be used in any way inconsistent with state, federal or international law or the law of any place to which the Aircraft may go, or contrary to any manufacturers' operation manuals and instructions, or in violation of any airworthiness certificate, license or registration. Operator shall not use or cause or permit the Aircraft to be used in any way that would endanger the registration or airworthiness of the Aircraft.

(c)    Compliance with Insurance. Operator shall not operate the Aircraft or permit or suffer the Aircraft to be operated in conflict with the terms of the insurance coverage pursuant to Section 8 of this Agreement. Operator shall abide by all geographical limitations of such insurance.

3.    RENT, TAXES AND EXPENSES

(a)    Rent and Invoicing. As rent for the lease of the Aircraft, the Operator shall pay to the Lessor rent at the hourly rate set forth on Schedule 1 hereto (the "Rent"). By the 15th day of each month during the Term, Operator will provide the Lessor a statement with respect to the

2

prior month (the "Statement") setting forth (i) Aircraft hours used and the corresponding Rent owed, and (ii) reimbursements due to the Operator from the Lessor for expenses incurred by the Operator that are the responsibility of Lessor hereunder (the "Reimbursable Expenses"). If the Rent owed exceeds the Reimbursable Expenses, Operator shall include a payment equal to the Rent owed less the Reimbursable Expenses to Lessor together with the Statement. If the Reimbursable Expenses exceeds the Rent owed, the Lessor shall pay the Operator an amount equal to the Reimbursable Expenses less the Rent owed within 10 days of the Lessor receiving the Statement.

(b)     Taxes. Operator shall be responsible for any and all taxes (other than those based on Lessor's income), including but not limited to sales, use, embarkation or passenger departure taxes, customs duties, charges or levies of the United States, any state or local government or any foreign government related to Operator's use, possession, or lease of the Aircraft (collectively "Taxes"). Except as otherwise specified in Schedule 1 or any applicable invoice, neither the Rent nor any other payments to be made by Operator under this Agreement includes the amount of any such taxes which may be assessed or levied by any taxing jurisdictions as a result of the lease of the Aircraft to Operator, or the use of the Aircraft by Operator.

(c)     Operating Costs. Operator shall be responsible for all direct operating expenses related to Operator's use of the Aircraft, including fuel, all necessary ground and flight operations support such as hangar while away from the Operating Base, Aircraft cleaning (interior and exterior), lavatory service, deicing, catering, and Aircraft stocks (i.e. newspapers, beverages, snacks), and all crew hiring costs and crew expenses. During the Term of this Agreement, Lessor shall be solely responsible for the cost and expense of hangaring the Aircraft at the Operating Base, all maintenance work provided or arranged by the Operator, and all insurance coverages proved by the Operator pursuant to the terms of this Agreement. To the extent the Operator initially incurs any costs and expenses that hereunder are the responsibility of the Lessor, the Lessor shall reimburse the Operator pursuant to the terms of Section 3(a) above.

(d)     Payments. All payments or reimbursements due by virtue of this Agreement shall be made to the Lessor or the Operator, as applicable, at such address or bank accounts as may be specified by the Lessor or the Operator, as applicable, by written notice from time to time.

4.     TITLE; SECURITY

Title to the Aircraft and all equipment subject to this Agreement is retained by Lessor at all times. Operator may not pledge or encumber the Aircraft in any manner whatsoever, nor permit any liens to attach thereto (other than liens arising by operation of law, liens solely attributable to Lessor, or maintenance or other workman liens arising in the ordinary course of business), and Operator shall promptly cause to be removed any such lien which may be placed on the Aircraft as a result of Operator's action or inaction hereunder. Lessor shall not permit any lien or encumbrance of any kind whatsoever to be created or exist upon the Aircraft if such lien or encumbrance may or does interfere with Operator's quiet use and enjoyment of the Aircraft hereunder.

3

## 5. REGISTRATION

Operator undertakes that at all times under this Agreement it shall not do or allow to be done anything whereby the registration of the Aircraft with the FAA may be forfeited or imperiled.

## 6. MAINTENANCE RECORDS; NO ALTERATIONS

(a)    Maintenance.  At all times during the term of this Agreement, the Aircraft shall be maintained by Operator (at Lessor's sole cost and expense) in strict accordance with Operator's operational specifications and maintenance program and FAA guidelines (including, without limitation, FAA Notice N8900.4 and Operations Specifications A002 and A008).  Operator shall maintain all of its log books and records pertaining to the Aircraft during the term of the Agreement in accordance with the FARs.  All such records shall be made available for inspection by Lessor upon request and shall be returned to Lessor at the end of the Term.

(b)    Use of Aircraft by Lessor.  In the event that Lessor or any affiliates of Lessor use the Aircraft in accordance with FAR Part 91, Lessor shall assure that no party performs any maintenance to the Aircraft except under the supervision of and authorization from Operator.  In the event of such Part 91 usage, Operator shall perform an appropriate conformity check upon return of the Aircraft to ensure the Aircraft is still in compliance with the Operator's maintenance program and that no unauthorized maintenance has been performed during such usage.

(c)    No Alterations.  Operator shall not make any modifications or alterations to the Aircraft, other than as required by Operator's operational specifications, without the express written consent of Lessor.

## 7. TERMINATION

(a)    Termination.  Either party, as applicable, may immediately terminate this Agreement upon the occurrence of any one of the following:

(i)    In the event that either party fails to pay sums due under this Agreement, and such failure is not corrected within 15 days after written notice by the non-defaulting party; or

(ii)    In the event the other party operates the Aircraft in a manner not permitted by applicable insurance, Operator's operational specifications or FAA rules or regulations, upon written notice by the non-defaulting party; or

(iii)    In the event the other party fails to observe or fulfill any term, condition and/or provision of this Agreement other than those specified in Sections 7(a)(i) or

4

7(a)(ii) and such failure is not corrected within 30 days after written notice by the non-defaulting party; or

      (iv)    Upon 30 days receipt by Operator of prior written notice by Lessor if Lessor sells the Aircraft to any third-party not controlled by, under control of, or under common control with Lessor.

    (b)    <u>Rights upon Termination</u>. Upon the termination of this Agreement, all rights of each party hereunder shall immediately cease and terminate, provided that (i) each party shall continue to owe to the other amounts owed at the end of the Term until paid in fill, and (ii) the provisions of Sections 4 and 5 shall survive the termination of this Agreement.

## 8.    INSURANCE

    (a)    <u>Insurance</u>. Operator shall, at Lessor's sole cost and expense, provide insurance coverage from a reputable insurance carrier related to Operator's possession, use, maintenance and operations of the Aircraft, as follows:

      (i)    <u>Liability</u>. The policies will include aircraft liability insurance to insure against liability for personal injuries, death or property damages, or any one or more of them, arising or occasioned in any manner by the acts or omissions of Lessor, Operator, or others with respect to the custody, operation or use of or with respect to said Aircraft with liability limits of not less than $100,000,000 per occurrence. Lessor shall be an additional insured on said policies.

      (ii)    <u>Hull Insurance</u>. The policies will insure against the loss or damage from any cause or causes to the Aircraft for not less than $1,200,000.00 unless a different value is agreed upon in writing between Operator and Lessor. Such policies shall be for the benefit of Lessor with Lessor named as the sole loss payee. Operator shall be responsible for the amount of the deductible, if any, if the damage to said Aircraft is incurred during Operator's use hereunder. Such policies need not include coverage against war risks.

      (iii)    <u>Conditions</u>. The policies shall also specifically grant approval for all Operator's pilots that meet the requirements of the policies, including, without limitation, pilots approved by the insurer and pilots that meet the requirements of any "open pilot warranty" under the policy. Such insurance under this Section 8 shall be primary, without any right of contribution from Operator or any insurance maintained by Operator.

      (iv)    <u>Certificates of Insurance</u>. Operator shall deliver to Lessor a certificate of insurance upon execution of this Agreement, as well as additional certificates from time-to-time as reasonably requested by Lessor, but not less often than annually.

      (v)    <u>Lessor's Insurance</u>. Nothing herein shall prohibit Lessor from maintaining similar policies on the Aircraft, and Lessor shall carry such insurance for all operations of

the Aircraft by Lessor or its affiliates and name Operator as an additional insured on all such liability policies. Each party shall cause its insurance policies to waive any rights of subrogation against the other party.

(b)     Indemnification by Operator. Operator agrees to indemnify, defend, and hold Lessor and all other users of the Aircraft harmless from any and all fines, citations, forfeitures, or penalties of any kind imposed by the FAA or any other governmental entity arising out of operation, use, or possession of the Aircraft by Operator during the term of this Agreement, except to the extent arising from the gross negligence or willful misconduct by Lessor or other users.

(c)     Indemnification by Lessor. Lessor agrees to indemnify, defend, and hold Operator harmless from any and all fines, citations, forfeitures, or penalties of any kind imposed by the FAA or any other governmental entity arising out of the operation, use, or possession of the Aircraft by Lessor or other users through Lessor, except to the extent arising out of the gross negligence or willful misconduct of Operator.

## 9.     REPRESENTATIONS AND WARRANTIES/DISCLAIMER

(a)     By Lessor. Lessor's represents and warrants to Operator that Lessor has full authority to enter into and fulfill this Agreement and has taken all steps and has done all acts required by applicable law to permit Lessor to enter into and fulfill this Agreement, and upon execution, this Agreement shall become the legal, valid and binding obligation of Lessor, enforceable in accordance with its terms.

(b)     By Operator. Operator represents and warrants to Lessor that:

(i)     Operator is not and shall not be bound by any other agreements, restrictions, or obligations which do or would in any way interfere with or be inconsistent with or be violated by this Agreement, nor shall Operator assume any such obligations or restrictions, which do or would in any way interfere with or be inconsistent with or be violated by this Agreement.

(ii)     Operator has full authority to enter into and fulfill this Agreement and has taken all steps and has done all acts required by applicable law to permit Operator to enter into and fulfill this Agreement and that upon execution, this Agreement shall become the legal, valid and binding obligation of Operator, enforceable in accordance with its terms.

(c)     **Disclaimer; Limitation of Liability.** EXCEPT AS EXPRESSLY STATED TO THE CONTRARY HEREIN, THE AIRCRAFT IS BEING LEASED BY THE LESSOR TO THE OPERATOR HEREUNDER ON A COMPLETELY "AS-IS, WHERE-IS," BASIS. THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THIS AGREEMENT ARE EXCLUSIVE AND IN LIEU OF, AND OWNER DISCLAIMS AND OPERATOR WAIVES, ALL OTHER REPRESENTATIONS OR WARRANTIES OF EVERY KIND WHATSOEVER,

WHETHER EXPRESS OR IMPLIED OR ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE, INCLUDING, WITHOUT LIMITATION, REPRESENTATIONS AND WARRANTIES, WITH RESPECT TO THE AIRCRAFT, OF AIRWORTHINESS, VALUE, CONDITION, DESIGN, MERCHANTABILITY, COMPLIANCE WITH SPECIFICATIONS, CONSTRUCTION AND CONDITION, OPERATION, FITNESS FOR A PARTICULAR USE, ABSENCE OF LATENT AND OTHER DEFECTS WHETHER OR NOT DISCOVERABLE, ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, AND QUALITY OF MATERIALS OR WORKMANSHIP. IN NO EVENT SHALL EITHER PARTY TO THIS AGREEMENT BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES ARISING FROM LOSS OF USE, LOSS OF REVENUE OR PROFIT, OR DIMINUTION IN VALUE OF THE AIRCRAFT.

10.     NOTICES

All notices or other communications required under this Agreement shall be in writing and shall be effective when delivered personally or deposited in the U.S. mail, postage prepaid, and addressed to the parties at their respective addresses set forth below, unless by such notice a different party or address shall have been designated in writing from time to time.

> If to Lessor:       Investment Leasing, LLC.
>                     1059 Hwy 5 NE
>                     Bottineau, ND 58318
>
> If to Operator:     North Central Aviation, Inc.
>                     670 West County Road B
>                     St. Paul, Minnesota 55113

11.     MISCELLANEOUS

(a)     Entire Agreement; Amendments.  This Agreement constitutes the entire agreement of the parties as of the date hereof and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises and warranties made with respect to the subject matter of this Agreement.  This Agreement may not be amended except in a writing signed by all parties.

(b)     Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibitions or unenforceability in any jurisdiction.  To the extent permitted by applicable law, each of Lessor and Operator hereby waives any provision of applicable law which renders any provision hereof prohibited or unenforceable in any respect.

7

(c)     No Assignment.  Neither party may assign its rights or obligations under this Agreement without the prior written permission of the other.

(d)     Further Assurances.  The parties hereto agree to cooperate with each other in effectuating this Agreement and, at the reasonable request of the other party, to execute and deliver such further documents or instruments and take such further actions as shall reasonably be requested in order to carry out the purposes of this Agreement.

(e)     No Waiver.  Neither party shall be deemed to have waived any breach by the other party of any provision of this Agreement unless it expressly does so in writing.  If either party shall expressly waive any right hereunder, such waiver shall not be construed as a continuing waiver of other rights under the same or other provisions of this Agreement.

(f)     Force Majeure.  Either party shall be relieved of its obligations hereunder if the performance hereof is delayed or prevented or interrupted by any cause beyond its reasonable control, including, but not limited to, acts of God, public enemies, war, civil disorder, fire, flood, explosion, labor disputes or strikes, or any acts or orders of any governmental authority.

(g)     Dispute Resolution.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Minnesota (excluding its choice of law rules), and any dispute arising hereunder shall be resolved in state or federal courts located in Hennepin County, Minnesota, and each party hereby waives any objection it might have to such a court, whether based on personal jurisdiction, an inconvenient forum, or otherwise.  In the event of any legal action or other proceeding concerning any term or condition of the Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred in that action or proceeding in addition to any other relief to which it may be entitled.

[Signature page follows.]

IN WITNESS WHEREOF, the undersigned parties hereby execute this Aircraft Lease Agreement N327ME on the date first written above.

N753MB

LESSOR:                                OPERATOR:

Investment Leasing, LLC.                North Central Aviation, Inc.

By: _____          By: _____
Print: _____          Print: _____
Its: _____          Its:    CFO

# EXHIBIT C

North Central Aviation
Incident Report N753MB
KFCM
12/05/2016
Pilot in Command: Clifton Rodahl, ATP #3450608
Second in Command: Kevin Skaggs, Commercial Pilot #3347990

## Overview of the Incident

This is a report of an incident involving two aircraft operated by North Central Aviation. On 5 December, 2016 at or about 1850 local time. N753MB, a Citation 560 being operated on a FAR 135 charter began taxiing from its parking spot and struck another aircraft (N457MD) parked on the ramp adjacent to it. N457MD, a Citation CJ-2 also operated by North Central Aviation was parked and unattended at the time of the incident. The left wing of N753MB struck N457MD on the right side of the forward fuselage from a point just aft of the pressure bulkhead and continuing forward through the right nose baggage door to a point near the skin junction with the radome. The light guard on the left wing of N753MB pierced the skin of N457MD just aft of the pressure bulkhead.

N753MB had completed a trip from KFCM (Flying Cloud Airport, Eden Prairie, MN) to KCLT and back. The scheduled times were:
Depart KFCM 0923 Arrive KCLT 1245
Depart KCLT 1600 Arrive KFCM 1804

The actual departure time from KFCM was 0915 and arrival back to KFCM was 1801. The crew had arrived for duty at or about 0800 and were scheduled to be done with duty at 1830 for a duty day of 10.5 hours.

## Manager of Flight Operations

At approximately 1715, Chris Gabiou, NCA Manager of Flight Operations, received a call from a client requesting a same day charter to Dallas, TX. Mr. Gabiou stated he noted that the incident aircraft was due to land at 1800 and advised the client he would have to check with the crew to see if they would accept the trip once they arrived at FCM. Upon contacting the crew, he was informed they would accept the trip and relayed this to the customer at approximately 1818. The Charter coordinator advised that he received a call from the client at approximately 1853 inquiring about a disparity in the flight time as the quote was for 2 hours and the crew had stated 3 hours. The passenger was concerned about not being able to get to his destination within his time constraints and a discussion ensued as to whether or not to continue the trip. The decision was ultimately made to continue. Mr. Gabiou advised he received a call from the crew of N753MB at 1902 that they had struck N457MD with their wing.

## Crew Interview

During an interview of the crew conducted by myself and John Putman, NCA Chief Pilot, the crew stated they had accepted the trip as requested, had conducted all necessary preflight planning and had conducted all pre-start, start, and pre-taxi checklists in a normal manner. They stated the passenger had

EXHIBIT C
NCA 0812

made a telephone call to the manager of flight operations regarding the scheduled flight time and had briefly interrupted them with a discussion regarding this telephone call, but they had discontinued any checklists and flight preparation until the issue was resolved and the passenger had been reseated. The captain stated that upon receipt of taxi clearance he began to taxi from their parking position and that no line personnel were there to marshal the aircraft from ramp. He stated that he turned too sharply to the left and did not see the other aircraft until too late to avoid collision. He also stated the lighting conditions on the ramp were poor and that the other parked aircraft was somewhat difficult to see.

A photograph of the aircraft taken as they had been parked prior to the incident is included below.



Following the incident, the aircraft were towed to their hangars by Thunderbird line service. The additional attachments are parking diagrams and statements provided by Thunderbird Aviation.

## Conclusions from Internal Investigation

As with any aviation incident or accident, there is never one simple cause but a number of factors that contribute to the event. Human error is inevitable and safety management is about setting up enough roadblocks to trap error before it results in an accident. Some of the key areas to focus on are culture, human factors, environment, and equipment.

### Culture

The general safety culture at NCA is good with buy-in across the organization. All members have embraced the newly introduced Safety Management System and are actively participating. A safety culture survey will be conducted in the first part of January 2017 to assess the continued engagement with the safety culture and capture areas where improvement is necessary.

### Human Factors

Individuals with the financial means to secure private aircraft transportation are uniquely demanding customers. They can apply pressure to flight crews and others within the organization subtly through behaviors as simple as body language, or overtly by verbally insisting the crews meet their schedule expectations. In this case, there was some concern voiced by the customer that the trip was going to be longer than he had originally been told and he had engaged in a phone conversation with the Director of Flight Operations and with the crew after the aircraft engines had been started. In addition, the crew was up against a duty time restriction that necessitated they get airborne with very little leeway. Both of these issues put pressure on the crew and may have been a contributing factor to this incident.

### Environment

The ramp at Thunderbird Aviation was poorly lit and this operation took place after sundown. The ramp had been reconstructed as a result of a runway extension. The FBO manager advised me that due to the proximity to the runway, the ramp had to remain unlit so as not to have ramp lighting interfere with the visibility of the runway lighting. Both pilots stated that the ramp was so dark that it was hard to see the other aircraft parked nearby. Usually line personnel will marshal aircraft from the parking area on an FBO ramp due to the proximity of other aircraft, but on this occasion, the line crew elected not to provide this service, but removed the wheel chocks and courtesy carpet that had been by the aircraft door prior to departure. There was conflicting information regarding the level of activity on the ramp that evening with the crew stating that there was not much activity, and the FBO stating that they were very busy and that that was the reason no marshaling service was provided. This would not seem to be completely accurate if there was a line person available to remove the chocks and carpet.

**Equipment**

There is no issue with the aircraft that would indicate the aircraft itself would have contributed to the accident.

**Recommendations**

1. Conduct a safety culture survey to capture any areas of weakness or that need attention . Survey will be completed not later than January 15, 2017.

2. Set hard times of 1.5 hours until "wheels up" for any pop-up trip that occurs while a crew is on duty or in flight such as in this case. For normal pop-up trips, a 3 hour minimum before "wheels up" will be instituted. In each case, this allows adequate time for the crew to make necessary pre-flight preparations and get to the airport.

3. Set a policy that no pilots will be "heads-down" or conducting any checklist items while maneuvering an aircraft on the parking ramp portion of the airport.

4. Set policy to utilize line personnel to marshal aircraft when they are available. In this case, they were available, but no formal request was made to have them marshal the aircraft from the parking ramp.

5. Conduct remedial training to emphasize human factors, runway incursion prevention, and flight and duty time restrictions.

6. Hold department meeting to discuss all the factors that were identified as contributing to this incident and communicate policy changes. Meeting will take place Monday, December 19, 2016.

7. Hold discussions with Thunderbird Aviation to communicate our requirements for service and ensure their personnel are adequately trained. Explore other alternatives to Thunderbird Aviation if we are not satisfied they can continue to meet our expectations.

---

Casey Norman
Safety Manager
North Central Aviation
670 County Road B
Roseville, MN 55113

# EXHIBIT D

# NCA Hazard Identification and Continuous Improvement Report

| Name: | ✓ | PIC | SIC | MX | Date: |
|---|---|---|---|---|---|
| Bill Rodahl | | PP | PM | Contractor | 12/05/2016 |
| | | Dispatch/Office Staff | | Flight Attendant | |

| Duty Period | | Trip Info | |
|---|---|---|---|
| Hours on duty prior to event: | 11 | Aircraft #: N759MB | |
| Flying hours flown prior to event: | 5.4 | From: FCM | To: CLT/FCM |
| Were you on extended duty or reduced rest prior to event? | | Date: | Event Time: 18:45 |

## Event Category (Check all that apply)

| | | | |
|---|---|---|---|
| ✓ Aircraft Damage | Altitude Deviation | ATC | A/C Configuration |
| CRM | Course Deviation | Crew Scheduling | Customer Service |
| Dispatch Issues | Exceeded Aircraft Limits | Flight Release | Heading Deviation |
| Landing W/O Clearance | MEL Issues | Maintenance Control | Rejected Takeoff |
| Ramp Service | Runway Incursion | TCAS R/A | Taxi/Runway Excursion |
| Unstabilized Approach | Weight & Balance | Other: | Other: |

## (Check all that Apply) Safety | Continuous Improvement

We returned from our trip to CLT and we were offered a pop up to DAL.I accepted,ordered fuel top off, did flightplanning,called fbo to confirm that they were open,had them book 2 rooms, and a car for our passenger. Our passenger arrived, went to plane, I told him that it was about a. 3 hour trip. He questioned it Kevin confirmed it.The start sequence was normal,Kevin got clearance and loaded it,Zac called Chris not certain Kevin spoke with him and flight time was questioned, call took about 4 min. Kevin then asked him were we going Zac said yes. Kevin got taxi clearance.i started taxi and struck the CJ. I had the ramp guys back it off, then park it.

| Signature: | Safety Review Board Requested | | |
|---|---|---|---|
| | Crewmember/Author | Yes | No |
| | Chief Pilot | Yes | No |
| | Director of Maintenance | Yes | No |
| | Safety Manager | Yes | No |

**EXHIBIT D**

NCA 0806

Root Cause identified:

Crewmember Recommendation to mitigate future incidents:

| Chief Pilot/Dir. of Maintenance Signature | Date | Chief Pilot/Dir. of Maintenance Recommendations |
|---|---|---|
| Safety Manager Signature | Date | Safety Manager Recommendations |

Action/Resolution (as necessary):

*Fill out form and return to Chief Pilot or Director of Maintenance as soon as possible for review/action. All completed forms will be forwarded to Safety Manager for safety action and tracking. Completion and submission of a NASA ARC 277B (NASA Aviation Safety Reporting form), if necessary, is recommended within 10 days of occurrence. If NASA submitted, please attach to this form. Use additional page if needed.*

## NCA Hazard Identification and Continuous Improvement Report

| Name: | PIC | ✓ | SIC | | MX | | Date: |
|-------|-----|---|-----|---|-----|---|-------|
| Kevin Skaggs | PF | ✓ | PM | | Contractor | | 12/5/2016 |
| | Dispatch/Office Staff | | | | Flight Attendant | | |

| Duty Period | | Trip Info | | |
|-------------|---|-----------|---|---|
| Hours on duty prior to event: | 10.5 | Aircraft #: | N763MB | |
| Flying hours flown prior to event: | 4.0 | From: KFCM | To: KDAL | |
| Were you on extended duty or reduced rest prior to event? | No | Date: 12/5/2016 | Event Time: | 0055UTC |

### Event Category (Check all that apply)

| | | | | | | |
|---|---|---|---|---|---|---|
| ✓ | Aircraft Damage | Altitude Deviation | | ATC | | A/C Configuration |
| | CRM | Course Deviation | | Crew Scheduling | | Customer Service |
| | Dispatch Issues | Exceeded Aircraft Limits | | Flight Release | | Heading Deviation |
| | Landing W/O Clearance | MEL Issues | | Maintenance Control | | Rejected Takeoff |
| | Ramp Service | Runway Incursion | | TCAS R/A | | Taxi/Runway Excursion |
| | Unstabilized Approach | Weight & Balance | | Other: | | Other: |

### (Check all that Apply)  Safety      Continuous Improvement

We entered N763MB and started engines at 0055 UTC. After engine start we went through our pre taxi setup starting with setting V speeds. After V speeds were reviewed and entered our passenger handed me his phone to talk to Chris Gablou about concerns related to our enroute flight time. My understanding is that the passenger was concerned about how late we would be arriving in Dallas for him to make it to a basketball game. Once we got verification from the passenger that he still wanted to go, I called flying cloud ground and got our IFR clearance while the PIC continued the pretaxi check. After the clearance was received I entered it into the GPS and setup our departure/arrival. Once I was done entering the flight plan I asked the PIC to review it and it looked good. He said it did so I asked if he was ready to taxi. He said he was and we began to roll forward to taxi. I reviewed the ATIS information on my knee pad and then prepared to call ground for our taxi clearance. It was at this time we had begun a left turn to enter the main aisle of the ramp/non-movement area to taxi out of the ramp area. I saw a brief reflection off the nose of N457MD out of the corner of my eye right at the instant that we collided with it. We stopped the aircraft and I called ground to cancel our clearance and we shutdown the engines. We exited the aircraft and saw that the left wing of N763MB had collided with the right side of the nose of N457MD. I proceeded to call Chris Gablou and inform him of the situation. He told us to leave the aircraft and that it would be inspected in the morning.

| Signature: | Safety Review Board Requested | | |
|------------|-------------------------------|-----|-----|
| | Crewmember/Author | Yes | No |
| Kevin J Skaggs | Chief Pilot | Yes | No |
| | Director of Maintenance | Yes | No |
| | Safety Manager | Yes | No |

| March 10, 2016 | North Central Aviation | NCA115 |
|----------------|------------------------|--------|

NCA 0808

Root Cause identified:

Crewmember Recommendation to mitigate future incidents:

| Chief Pilot/Dir. of Maintenance Signature | Date | Chief Pilot/Dir. of Maintenance Recommendations |
|---|---|---|
| | | |
| Safety Manager Signature | Date | Safety Manager Recommendations |
| | | |

Action/Resolution (as necessary):

*Fill out form and return to Chief Pilot or Director of Maintenance as soon as possible for review/action. All completed forms will be forwarded to Safety Manager for safety action and tracking. Completion and submission of a NASA ARC 277B (NASA Aviation Safety Reporting form), if necessary, is recommended within 10 days of occurrence. If NASA submitted, please attach to this form. Use additional page if needed.*

March 10, 2016          North Central Aviation          NCA115

NCA 0809

On Monday 12/05/16 at approximately 1900, two North Central Aviation aircraft (N753MB & N457MD) made contact on our ramp. It was a busy night with multiple inbound and outbound aircraft. The linemen that were on duty were Tom Erickson, Anders Montean, Corey Evans and myself Jordan Bishop. N753MB was getting ready to take off with one passenger which ended up being a pop up trip for them. When they arrived they parked facing West in the number two spot on row one. The airplane was chocked and coned and the crew requested 40/gal. of Jet A per side. While fueling, N457MD pulled in next to N753MB and deplaned. During this time N753MB contacted our CSR saying they needed more fuel, and requested the airplane to be topped off. The fuel truck returned to complete the fueling. Lineman Corey Evans then pulled the jet fuel truck over to a King Air 90 after fueling N753MB for the second time, to be fueled. Over the radio, we heard chatter that it was possible N753MB was departing, as people had walked out the plane (which sometimes is just the pilots preparing for a flight). ((The pilots seemed rushed and did not tell our CSR they were leaving.)) There was confusion on if N753MB was departing, until the engines were started up. When the engines began to spool up, Lineman Evans stopped fueling the King Air, went over to N753MB and pulled the chalks and took the carpet. Lineman Evans then returned to the King Air, while calling on the radio for my assistance with N753MB. As you will see in the diagram, N753MB and N457MD where parked next to each other. During this time, on row three a Cirrus SR-22 came in on our ramp. Lineman Erickson went to row three to marshal in the Cirrus and I stayed with N753MB. When they turned out and began to turn towards the south I could tell they were continuing to turn more southeast. I began to wave my hands and chase after the airplane which collided with N457MD. The pilots turned off their engines and got out of the plane. I activated our Emergency Response Plan and called Chris Cape, I stayed to attend to the incident that just took place. The pilots told me to move N753MB away from N457MD. I went and got the lecktro and moved N753MB away from N457MD and put N753MB in its spot where they started taxiing out of. The passenger from N753MB got in his car and left. The pilots from N753MB also ended up getting in their cars and leaving.



What they did.

Building

Alpha Taxiway