Starr Indemnity & Liability Company,   Civil No. 18-98 (DWF/TNL)

    Plaintiff,

v.   **MEMORANDUM OPINION AND ORDER**

North Central Aviation, Inc.,

    Defendant.

_____

Robert William Vaccaro, Esq., and Timothy R. Schupp, Esq., Meagher & Geer, P.L.L.P., counsel for Plaintiff.

Sharon L. Van Dyck, Esq., Van Dyck Law Firm, PLLC, and Tyler P. J. Brimmer, Esq., Fafinski Mark & Johnson P.A., counsel for Defendant.

_____

# INTRODUCTION

This is an insurance coverage dispute over whether Plaintiff Starr Indemnity & Liability Company ("Starr") has an obligation to defend or indemnify Defendant North Central Aviation, Inc. ("NCA") in connection with a lawsuit arising from an airplane collision in 2016. The parties agree on the underlying facts of the case, however dispute whether an exclusion bars coverage. Each party filed a motion for summary judgment. (Doc. Nos. 20, 25.) For the reasons set forth below, the Court grants Starr's motion and denies NCA's motion.

## BACKGROUND

The parties do not dispute the following facts. Starr is a property and casualty insurance company incorporated in Texas with its principal place of business located in New York. (Doc. No. 1, Complaint ("Compl.") ¶ 6.) NCA is a Minnesota corporation which provides personal aircraft charter and management services. (Compl. ¶ 7.)

NCA leased a Cessna Citation CJ-2 jet with tail number N457MD ("Aircraft 1") from BreezeAir, LLC ("BreezeAir") through an agreement dated February 15, 2016. (Compl. ¶ 14; Doc. No. 23, ("Vaccaro Decl." ¶ 2), Ex. A ("Aircraft 1 Lease Agreement").) NCA also leased a Cessna Citation V jet with tail number N753MB ("Aircraft 2") from Investment Leasing, LLC ("Investment Leasing") through an agreement dated June 1, 2016. (Compl. ¶ 15; Vaccaro Decl., Ex. B ("Aircraft 2 Lease Agreement").)

On the evening of December 5, 2016 both planes were at the Flying Cloud Airport in Eden Prairie, Minnesota. (Compl. ¶ 16; Vaccaro Decl. ¶ 4, Ex. C NCA Incident Report N753MB dated Dec. 5, 2016 ("Incident Report").) Aircraft 2 was piloted by an NCA crew (*Id.*); Aircraft 1 was last piloted, then parked at approximately 6:00 p.m., by a separate NCA crew. (Incident Report; Doc. No. 27, ("NCA Memo"), Ex. D ("Lurie Depo.") at 14-19.) At approximately 7:00 p.m. local time, while taxiing from its parking spot, Aircraft 2 collided with parked and stationary Aircraft 1. (Incident Report.) NCA concedes that it is "likely to be held legally liable for the collision" resulting from the actions of its crew who were operating Aircraft 2 at the time of the incident. (NCA Memo at 8.)

*Aircraft 1 Lease Agreement*

The Aircraft 1 Lease Agreement contains several provisions critical to the issues in controversy. Section 1, entitled "Lease Term," specifies that the agreement will continue "in full force" for a term of one year, and renew automatically for one-year terms. (Aircraft 1 Lease Agreement § 1.) The same section instructs that the aircraft "shall be delivered by Lessor [BreezeAir] to Operator [NCA] for each usage at the Anoka County-Blaine Airport . . . (the 'Operating Base'), unless otherwise agreed by the parties." (*Id.*)

Section 2, "Use of Aircraft," includes the designation of the agreement as a "dry lease." In relevant part, this means that in its role as Operator, NCA "shall have and maintain operational control" over the plane during initiation, conduct, and termination of a flight and that NCA shall be "solely responsible for supplying a flight crew" for its operations. (*Id.* at § 2(a)(i)-(iii).)

Section 3 of the agreement, "Rent, Taxes and Expenses," requires "rent for the lease of the Aircraft" to be paid by monthly invoice at a specified hourly rate according to "Aircraft hours used." (*Id.* at § 3(a).) This section also states that as Operator, NCA shall be responsible for expenses related to the use of Aircraft 1 including "all necessary ground and flight operations support such as hangar while away from the Operating Base." (*Id.* at § 3(c).) Clause 3(c) goes on to state that the Lessor, BreezeAir, "shall be solely responsible for the cost and expense of hangaring the Aircraft at the Operating Base . . . ." (*Id.*)

3

Section 8, "Insurance," requires the Operator to "provide insurance coverage from a reputable insurance carrier related to Operator's possession, use, maintenance and operations of the Aircraft," and specifies that "[t]he policies will include aircraft liability insurance to insure against liability for personal injuries, death or property damages . . . ." (*Id.* at § 8(a); (a)(i).)

*Aircraft 2 Insurance Policy*

Aircraft 2, which inflicted the damage on Aircraft 1, was insured at the time of the collision by Starr through a policy stating a coverage period of June 8, 2016 to June 8, 2017. (Compl. ¶ 20; Vaccaro Decl. ¶ 6, Ex. E, (the "Policy") at 1.) The Policy named the aircraft owner, Investment Leasing, as the insured, and included an "Additional Insured Endorsement" naming NCA as an additional insured. (Compl. ¶ 20; Policy at 57.)

Section I of the Policy includes Coverage B - Property Damage Liability. (Compl. ¶ 22; Policy at 4.) The Policy defines "property damage" as

> (a) physical injury to or destruction of tangible property which occurs during the policy period, including loss of use thereof at any time resulting therefrom, or (b) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

(Compl. ¶ 23; Policy at 16.) The term "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage during the policy period neither expected nor intended from the standpoint of the insured." (Compl. ¶ 24; Policy at 15.)

4

The Policy states in Section IV that Starr, as insurer, "shall have the right and duty to defend any suit against [NCA] seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent." (Policy at 5.)

The Policy also contains exclusions to its coverage; in pertinent part Exclusion No. 7 specifies that the policy does not apply to "property damage to property owned, occupied, rented or used by the insured or in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control or transported by the insured." (Compl. ¶ 27; Policy at 10.)

*The Underlying Lawsuit*

The parties reached the point of controversy as a result of litigation initiated by the owner of Aircraft 1. (Compl. ¶ 11; Doc. No. 23 Ex. G ("the Underlying Lawsuit").) BreezeAir, owner of Aircraft 1, filed a complaint against the owner of Aircraft 2, Investment Leasing, as well as NCA that contained three counts: Count I-Breach of Contract (against NCA for failing to provide adequate insurance coverage); Count II-Negligence (against NCA for striking Aircraft 1 in the collision); and Count III-Vicarious Liability (against Investment Leasing). BreezeAir filed an amended complaint in the underlying suit dated February 23, 2018, but the facts recounted and the allegations against NCA remained unchanged. (Doc. No. 23, Ex. H, ("Amended Compl.").) As previously discussed, the Underlying Lawsuit arose from a collision between Aircraft 1 and Aircraft 2 on December 5, 2016.

NCA tendered the defense of the Underlying Lawsuit with respect to Count II to Starr on October 24, 2017. (Doc. No. 9 ("Counterclaim") ¶ 4; Doc. No. 22 at 9.)[1] Starr declined tender on November 3, 2017. (Doc. 22 at 9.)

Starr alleges that the damages sought against NCA in Count II of the Underlying Lawsuit are excluded from coverage under the Policy because the incident was not an "occurrence" as defined therein, and because Aircraft 2 was in NCA's use, care, custody, and control at the time of the collision. (Compl. ¶¶ 28-30.)

NCA alleges that Starr wrongfully denied any obligation pursuant to the Policy to either defend against or indemnify NCA with respect to the damages claimed in the Underlying Lawsuit. (Counterclaim ¶ 5.)

Each party filed a Motion for Summary Judgment. (Doc. Nos. 20, 25.) Starr seeks a declaration that no coverage exists in connection with the Underlying Lawsuit. (Doc. Nos. 20, 24.) NCA asks the Court to declare that Starr breached its contractual duty to defend NCA in the Underlying Lawsuit, and that NCA is entitled to damages, costs, and expenses resulting from and relating to Count II of the Underlying Lawsuit. (Doc. Nos. 25, 29.)

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] NCA is not seeking coverage from its insurer, Starr, on the basis of Count I of the underlying lawsuit. (Counterclaim ¶ 34.)

Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Phillips v. Matthews*, 547 F.3d 905, 909 (8th Cir. 2008).

## II.     Interpretation of Insurance Contracts

The critical issues in this case turn on the proper interpretation of provisions in two contracts, namely, the applicability of Exclusion 7 of the Policy in light of the terms of the Aircraft 1 Lease Agreement. In exercising diversity jurisdiction, state law controls the construction of insurance policies. *Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172, 1174 n.3 (8th Cir. 2012), (*citing Langley v. Allstate Ins. Co.*, 995 F.2d 841,

844 (8th Cir. 1993)). The parties agree that Minnesota law applies in this case. Under Minnesota law, interpretation of an insurance policy is a question of law. *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). Interpretation of insurance contracts follows "the general rules of contract law, giving terms their plain and ordinary meaning to honor the intent of the parties." *Econ. Premier Assur. Co. v. W. Nat. Mut. Ins. Co.*, 839 N.W.2d 749, 752 (Minn. Ct. App. 2013).

Whether the language of an insurance policy is ambiguous is also a question of law. *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn. 1979). "If the language of the policy is reasonably subject to more than one interpretation, there is ambiguity. If it is not reasonably subject to more than one interpretation, there is no ambiguity." *Id.* Ambiguities are interpreted against the insurer, in favor of finding coverage. *Econ. Premier Assur. Co.*, 839 N.W.2d at 755. This serves the goal of protecting the insured, who is usually a "professionally unsophisticated consumer," but this rule applies even to a dispute between an insurer and a "sophisticated insured with equal bargaining power." *Id.*; *see also Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172 (8th Cir. 2012) (applying Minnesota law). However, courts should resist finding ambiguity where none exists (*Metro Prop. & Cas. Ins. Co. v. Jablonske*, 722 N.W.2d 319, 323 (Minn. Ct. App. 2006) (applying Minnesota law)), as they "have no right to read an ambiguity into the plain language of an insurance contract in order to construe it against the insurer." *Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 651 (Minn. 1986). Policies should be construed as a whole, giving unambiguous language its "plain and ordinary" meaning.

8

*Id.* There is a presumption that the parties intended the language used to have effect (*Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990)), and an interpretation rendering any contract term or provision meaningless should be avoided. *Econ. Premier Assur. Co.*, 839 N.W.2d at 755.

Insurance policy exclusions must be given the same consideration as any other part of the contract in determining the scope of coverage. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 880 (Minn. 2002). Courts are required to read policies in favor of finding coverage, construing words of inclusion broadly, but words of exclusion narrowly, and looking past the words used by the parties to the underlying allegations. *Westfield Ins. Co.*, 700 F.3d at 1174 (applying Minnesota law). The language of an exclusion is to be interpreted in accordance with the expectations of the insured. *Thommes*, 641 NW.2d at 880. These expectations, in turn, are to be considered in light of the exclusion's purpose. *Am. Family Mut. Ins. Co. v. Peterson*, 405 N.W.2d 418, 422 (Minn. 1987).

The "two most common" exclusions in liability insurance contracts addressing concerns about liability related to property over which the insured has "some right of dominion" exclude coverage for property in the insured's "care, custody, and control" or property "owned, rented, or occupied" by the insured. *Generally*, 9 Couch on Ins. § 126:16 (3d ed. 2018). This serves the purpose of preventing general liability insurance from becoming tantamount to property insurance when property is in the hands of a bailee or lessee, or is otherwise in the "custody and control" of the insured. *Gaza Beef,*

9

*Inc. v. Grinnell Mut. Reinsurance Co.*, No. A11-444, 2011 WL 3654533, at \*4 (Minn. Ct. App. Aug. 22, 2011) (internal citations omitted).

An insurer assumes two duties under Minnesota law, to defend and to indemnify, the former broader than the latter. *Selective Ins. Co. of Am. v. Smart Candle,* LLC, 781 F.3d 983, 985 (8th Cir. 2015). If there is no duty to defend, there is no duty to indemnify. *Id.* Whether an insurer has a duty to defend or indemnify the insured when an action arises is a legal question. *Franklin v. W. Nat. Mut. Ins. Co.*, 574 N.W.2d 405, 406 (Minn. 1998). If an insurance policy exclusion applies to all of the legal claims asserted in an underlying lawsuit, it precludes coverage (*Westfield Ins. Co.* 700 F.3d at 1175), but if any claim is arguably covered under the policy, then the insurer must defend. *Selective Ins. Co.*, 781 F.3d at 985 (applying Minnesota law); *see also SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 316 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009). The duty to defend extends to every claim arguably within the scope of coverage, regardless of the merits of the underlying claim. *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006). "Where there is no coverage by reason of an exclusionary clause, there is no obligation to defend." *Bobich v. Oja*, 104 N.W.2d 19, 24 (1960). An insurer must prove that all claims in the suit "are clearly outside coverage" to show it does not have a duty to defend (*Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co.*, 819 N.W.2d 602, 615 (Minn. 2012)), which places upon the insurer a "heavy burden." *In re Liquidation of Excalibur Ins. Co.*, 519 N.W.2d 494, 497 (Minn. Ct. App. 1994). If the insurer meets this burden, the burden of proof shifts to the insured to establish that an exception to the

exclusion restores coverage. *Friedberg v. Chubb & Son, Inc.*, 832 F. Supp. 2d 1049, 1059 (D. Minn. 2011), *aff'd*, 691 F.3d 948 (8th Cir. 2012) (internal citations omitted).

Here, the parties dispute whether Starr has a duty to defend or indemnify with respect to Count II of the Underlying Lawsuit. As recited above, the insurance Policy in effect at the time of the collision that led to the Underlying Lawsuit included coverage for property damage, as well as a duty to defend against a lawsuit related to property damage. (Compl. ¶¶ 22-24; Policy at 4-5, 15-16.) Exclusion No. 7 specifies that the Policy does not apply to "property damage to property owned, occupied, rented or used by the insured or in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control or transported by the insured." (Compl. ¶ 27; Policy at 10.) Section 1 of the Aircraft 1 Lease Agreement states that the aircraft "shall be delivered by Lessor [BreezeAir] to Operator [NCA] for each usage at the Anoka County-Blaine Airport . . . (the 'Operating Base'), unless otherwise agreed by the parties." (Aircraft 1 Lease Agreement § 1.) Section 2 states that the Defendant "shall have and maintain operational control" over the plane during initiation, conduct, and termination of a flight" (*id.* at § 2(a)(i)-(iii)), and in Section 3 the parties agree that "rent for the lease of the Aircraft" is to be paid by monthly invoice at a specified hourly rate according to "Aircraft hours used." (*Id.* at § 3(a).) Section 3 also requires NCA to be responsible for expenses related to the use of Aircraft 1 including "all necessary ground and flight operations support such as hangar while away from the Operating Base," and distinguishes this level of responsibility from that required when Aircraft 1 is at its Operating Base, when the lessor assumes all costs. (*Id.* at § 3(c).) Section 8,

11

"Insurance," requires the Operator to "provide insurance coverage . . . related to Operator's possession, use, maintenance and operations of the Aircraft . . . includ[ing] aircraft liability insurance to insure against liability for personal injuries, death or property damages." (*Id.* at § 8(a)(i).) These facts are not in dispute.

Starr argues that Exclusion 7 of the Policy applies because properly construed and applied, Aircraft 1 is excluded because it was in NCA's "care, custody, or control." NCA concedes that the language of the Policy is not ambiguous. (NCA Memo at 7.) Notwithstanding the lack of ambiguity, NCA contends that Exclusion 7 does not apply because Aircraft 1 was not in its care, custody, or control when the collision occurred. Specifically, NCA interprets its lease with BreezeAir to mean that when it parked Aircraft 1 at the Flying Cloud Airport, it effectively returned the aircraft to its owner. (NCA Memo at 10.)

The Court finds that Exclusion 7 applies. When Aircraft 2, piloted by one NCA crew, hit Aircraft 1, both airplanes were under NCA's care, custody, and control. Further, under the terms of the Aircraft 1 Lease Agreement, NCA has priority access to Aircraft 1 in exchange for payment of various operating expenses and rental fees at a rate determined by flight time. As NCA concedes, NCA had the "right of possession and control" when Aircraft 1 was "on the ground away from its Operating Base." (Doc. No. 33, NCA Memorandum in Opposition to Starr's Motion for Summary Judgment

("NCA Opposition Memo") at 6-7.) NCA contends that on the date of the collision, Flying Cloud Airport was the agreed-upon Operating Base.[2] *Id.*

When ambiguity is found, extrinsic evidence may be considered as a factor in construction of a contract. *Transp. Indem. Co. v. Dahlen Transp. Inc.*, 161 N.W.2d 546, 550 (Minn. 1968). If the evidence is not conclusive, construction of the contract is a question of fact (*Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 368 (Minn. 2005)), but if it "is conclusive and undisputed and renders the meaning of the contract clear," construction of the contract is a question of law. *Transp. Indem. Co.*, 161 N.W.2d at 550.

Neither party provided a superseding lease agreement stating that any location other than the Anoka County-Blaine Airport would be considered Aircraft 1's Operating Base. NCA submitted several documents in support of its contention, briefly addressed in turn. NCA's Chief Financial Officer averred that NCA entered a lease agreement on March 10, 2016 in order to base Aircraft 1 out of Flying Cloud Airport. (Doc. No. 34, ("Fjestad Decl.") ¶ 6.) This contract, though it leases Lot 90B at Flying Cloud to NCA "for the storage of aircraft," does not expressly state that Flying Cloud will henceforth serve as Aircraft 1's new Operating Base. (Fjestad Decl., Ex. A at § 1, p. 1-2.) Another contract furnished, a lease between owner BreezeAir and AGAPE Mechanical, leased Aircraft 1 to AGAPE Mechanical for a term of April 29, 2016 to April 30, 2017 and named, "[f]or the purposes of this [l]ease" *either* Flying Cloud Airport *or* the Bemidji

---

[2] The lease specifies that the Operating Base is Anoka County-Blaine Airport.

Airport in Bemidji, Minnesota as Aircraft 1's "permanent base of operation." (Fjestad Decl., Ex. E, Aircraft Lease dated §§ 1,10, pp. 1, 4.)

To the extent that contracts involving other matters between the parties to the Aircraft 1 Lease Agreement discuss the possibility of another base, those contracts are unpersuasive and do not change the Court's analysis of the Aircraft 1 Lease Agreement as to its impact on construction of the insurance Policy's scope of coverage. While this contract is lamentably silent as to when precisely control is transferred from lessee back to lessor, it is unambiguous that Aircraft 1's Operating Base is not Flying Cloud Airport, and that the lessor is obligated to commence transfer of custody of the aircraft for each use from its actual Operating Base of Anoka County-Blaine. Read together, it is clear that Aircraft 1 was under NCA's care, custody, and control at the time of the collision. No reasonable expectation of the insured exists to the contrary. Thus, Exclusion 7 of the Policy applies, and Starr does not have a duty to defend against the Underlying Lawsuit.

## CONCLUSION

The Court finds that Starr does not have a duty to defend or indemnify NCA because Exclusion 7 bars coverage in the Underlying Lawsuit.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Plaintiff Starr Indemnity & Liability Company's Motion for Summary Judgment (Doc. No. [20]) is **GRANTED.**

2. Defendant North Central Aviation Inc.'s Motion for Summary Judgment (Doc. No. [25]) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 2, 2019                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge